**FABRICAS EL CARMEN, S.A., de C.V., et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Court No. 85–04–00558.**

United States Court of
International Trade.

Oct. 7, 1987.

Skadden, Arps, Slate, Meagher & Flom (Thomas R. Graham) for plaintiff Derivados Acrilicos, S.A.

Cabinet Hays (Alan S. Hays and Ben L. Irvin) and Green and Hillman (Richard G. Green) for all other plaintiffs.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch (J. Kevin Horgan), Civ. Div., U.S. Dept. of Justice, for defendant.

## OPINION AND ORDER

RESTANI, Judge:

Plaintiffs challenge an affirmative countervailing duty determination of the United States Department of Commerce, International Trade Administration (ITA) finding that a net bounty or grant of 3.7% *ad valorem* is bestowed upon certain Mexican textile mill products by export related FOMEX loans.[1] *See, Certain Textile Mill Products from Mexico*, 50 Fed.Reg. 10824 (Mar. 18, 1985) (final affirmative countervailing duty determination and order). Plaintiffs raise the following major issues in their motion for judgment upon an agency record pursuant to Rule 56.1 of the rules of this court:

(1) Whether the effects of Mexico's dual exchange system or other factors negate or offset any benefit which the FOMEX program might bestow upon exporters of textile mill products;

(2) Whether ITA erred in failing to use the Government of Mexico's cost of bor-

---

1. ITA translates FOMEX to stand for the "Fund for the Promotion of Exportation of Mexican Manufactured Products." *Certain Textile Mill Products from Mexico*, 50 Fed.Reg. 10824 (Mar. 18, 1985) (final affirmative countervailing duty determination and order). FOMEX is a trust of the Secretaria de Hacienda y Credito Publico established to promote the manufacture and sale of exported products. 50 Fed.Reg. at 10825. The Bank of Mexico acts as its trustee and, as of July 27, 1983, the fund has been formally incorporated into the National Bank for Foreign Trade. *Id.*

ITA also found that bounties or grants were conferred by the following programs: Preferential Federal Tax Credits (CEPROFI), Fund for Industrial Development (FONEI), and Guarantee and Development Fund for Medium and Small Industries (FOGAIN). *Id.* In its preliminary determination, ITA found that the four programs conferred bounties or grants of: 3.7% (FOMEX), 2.1% (CEPROFI), 2.27% (FONEI), and 3.2% (FOGAIN). *Certain Textile Mill Products from Mexico*, 50 Fed.Reg. 301 (Jan. 1, 1985) (preliminary determination). It was quickly discovered that the benefits attributed to three of the programs had been overstated by three decimal points, and in its final determination ITA found bounties or grants of: 3.7% (FOMEX), 0.0005% (CEPROFI), 0.009% (FONEI), and 0.005% (FOGAIN). 50 Fed.Reg. at 10825–26.

rowing in calculating the benefit bestowed by FOMEX loans;

(3) Whether ITA erred in disregarding increases in FOMEX interest rates, which were reported and known to ITA prior to both its preliminary and final determinations, but which took effect beyond the period under investigation;

(4) Whether ITA erred in failing to include data on certain companies in the base upon which a country-wide countervailing duty rate was calculated, particularly data on companies that were found to have received *de minimis* benefits or no benefits at all; and

(5) Whether ITA erred in failing to establish a two-tier countervailing duty deposit rate in this case.

ITA initiated its countervailing duty investigation on August 13, 1984, 49 Fed. Reg. 32894 (Aug. 17, 1984), and sent its first questionnaire to the Government of Mexico on August 24, 1984, defining the period of review as the calendar year 1983 and any fiscal quarters completed thereafter. P.R. 15. The period of review was subsequently limited to 1983. *Certain Textile Mill Products from Mexico*, 50 Fed.Reg. at 304 (preliminary determination) and 50 Fed.Reg. at 10825 (final determination). The Government of Mexico's response indicated, among other things, that the industry subject to investigation was made up of 2,150 companies, 95% of which were small or medium size firms, and that more than 85% of the industry's exports to the U.S. were represented by 27 listed exporters. P.R. 27 and Confidential Record (C.R.) 1 at I.A., I.B. and Exhibit C. ITA

sent questionnaires to 26 of the 27 firms reported by the Government of Mexico.[2] Four of those 26 investigated companies either did not export the subject merchandise during the period of review, or produced products that were not included in the investigation. Six of the remaining 22 firms, as well as seven others, were excluded from ITA's determinations upon timely requests and verification that they did not receive greater than *de minimis* benefits. 50 Fed.Reg. at 302 (preliminary determination); 50 Fed.Reg. at 10825 (final determination).

The 16 remaining firms provided, in part, the basis for ITA's calculation of a country-wide countervailing duty rate resulting from the FOMEX program. ITA concedes, however, that it erred in its calculations. Defendant requests a remand after all contested issues have been resolved for the limited purpose of correcting its "computational" errors.

## DISCUSSION

### I. THE EFFECT OF THE CONTROLLED EXCHANGE RATE SYSTEM UPON BENEFITS RECEIVED FROM FOMEX LOANS

In 1982, the Government of Mexico decreed that two foreign exchange markets would function simultaneously in the country—one free-floating and the other subject to control. Foreign Currency Exchange Decree effective December 20, 1982 *reprinted in* [Statutory Volume] *Doing Business in Mexico* app. W2, W2–3 (S. Lefler ed. 1987) (English translation).[3] *See*

---

**2.** The Government of Mexico added a 28th name to their list, P.R. 36 at 12. The 28th firm had not yet exported textile mill products into the U.S., *id.*, and was not investigated. Defendant's Brief at 36. Another firm, Industrias Polifil, was already subject to a suspension agreement in another proceeding, *see Yarns of Polypropylene Fibers from Mexico*, 48 Fed.Reg. 5581 (Feb. 7, 1983) (suspension of investigation), 48 Fed.Reg. 14427 (Apr. 4, 1983) (final affirmative countervailing duty determination), and was excluded from the scope of ITA's investigation. Defendant's Brief at 36; 50 Fed.Reg. at 302.

**3.** The December 20, 1982 decree provides the statutory basis for Mexico's dual exchange markets at issue in this case and was explicitly

referenced and relied upon by the Government of Mexico in its answers to ITA's questionnaire. *See* Public Record (P.R.) 56 at II.I. In response to the court's request for English translations of the 1982 decrees at issue, the parties submitted a Decree Establishing General Exchange Controls appearing in the September 1, 1982 Official Diary. This decree, however, does not directly provide for Mexico's dual exchange rate system. In addition, the September 1, 1982 decree was apparently annulled by the December 20, 1982 decree. *Doing Business in Mexico* at app. W2–7 ("All of the following are annulled: the Decree establishing Generalized Foreign Currency Exchange Controls as published in the Official Gazette of the Federation on September 1, 1982....").

Public Record (P.R.) 56 at II.I. According to the Government of Mexico, "[t]he controlled rate was applicable to all exports and services, except the maquiladora (in bond) industry, handcrafts and the tourist industry." [4] P.R. 56 at II.A. *See* P.R. 56 at II.I. The Foreign Currency Exchange Decree provides that exports which are subject to the controlled rate must be invoiced in foreign currencies, and that "[i]n no case shall exports be contracted to be paid in national currency." *Doing Business in Mexico* at app. W2-4 (Article Three of the Decree). It is claimed that during 1983, the period under investigation, the controlled rate was about 25% lower than the free market rate, P.R. 56 at II.I, and 31% lower than the international rate of exchange. P.R. 103 at III.A.1. Thus, pursuant to the Foreign Currency Exchange Decree, non-exempt exporters incur significant losses when they must exchange their U.S. dollar earnings for Mexican pesos at the less favorable controlled rate of exchange.

The FOMEX programs at issue involve pre-export and export loans to firms exporting manufactured products. P.R. 36 at A.a.5 and A.a.6. Pre-export loans general-

**4.** Article Two of the decree provides that the controlled foreign currency market includes certain: (a) exports of merchandise (with exceptions, to be established by regulation, for merchandise that is unsuited to control); (b) payments made by "in bond" assembly companies for goods and services (wages, salaries, rentals); (c) capital and interest on foreign currency financing; (d) imports of merchandise; (e) expenses, fees and contributions relating to Mexican Foreign Service and participation in international organizations; and (f) those areas provided for through Treasury Department regulations. *Doing Business in Mexico* app. W2-3.

**5.** If dollar loans were paid out in dollars and repaid in dollars, there might be no currency conversion at any rate of exchange, and no loss in either the receipt or repayment of the loan. If, on the other hand, dollar loans were converted to pesos, firms could suffer a loss in the receipts of "dollar" loans. In addition, plaintiffs argue that the repayment of such loans could result in a loss associated with the devaluation of pesos over time (even though the repayment would not involve a currency conversion). This devaluation loss is based upon the assumption that if loans are actually paid out in pesos, repayment should be linked to the number of pesos actually received, rather than the dollar

ly are made in Mexican pesos, though they were temporarily available in U.S. dollars. Export loans are to be made in U.S. dollars. *Id.*

## A. THE POSITIONS OF THE PARTIES

The parties do not dispute that an exchange rate loss is incurred by firms repaying FOMEX peso loans, where U.S. dollar earnings are converted to pesos at the time of repayment at the controlled, rather than free, rate of exchange. Plaintiffs allege, however, that FOMEX "dollar" loans were actually paid out in pesos, at the controlled rate of exchange, and argue that as a result, firms also incurred exchange rate losses in the receipt of, and devaluation losses in the repayment of, FOMEX "dollar" loans.[5] ITA responds that there was insufficient evidence presented to consider the allegation that dollar loans were actually paid out in pesos, and that this allegation was not raised until after ITA had conducted its verification. The court finds that plaintiffs had ample opportunity to make a timely presentation of evidence to support this allegation, and they failed to do so.[6]

amount of the loan. For example, if a firm took out a $100 (U.S. dollar) loan it would have to assign $100 of its U.S. dollar earnings to the repayment of the loan principal. The firm would actually receive, however, only the peso equivalent of that $100 at the time of the loan. If the applicable exchange rate at the time of the loan was 150 pesos to the dollar, the firm would receive 15,000 pesos. If, due to devaluation, the exchange rate at the time of repayment was 200 pesos to the dollar, then the assigned U.S. dollar earnings, $100, would be worth 20,000 pesos. Under plaintiff's reasoning, the amount of assigned U.S. dollar earnings should be reduced in that case to $75—or the current equivalent of the 15,000 pesos originally paid to the firm.

**6.** The alleged payment of "dollar" loans in pesos was not mentioned by either the Government of Mexico or counsel for certain excluded firms when they asked ITA to consider losses incurred by the firms under investigation. P.R. 56, 58 & C.R. 3. Furthermore, ITA's questionnaires specifically asked firms to specify "the currency (pesos or dollars)," of each loan received, and asked the Government of Mexico to explain "the specific nature and terms of the assistance received by the companies under investigation." P.R. 15 at 5 & 50 at 11. The only response which might have suggested the possibility that

It may be, however, that what plaintiffs mean by receipt of dollar loans in pesos is that those in plaintiffs' position seem to be required by law in some instances to sell at the official rate the foreign currency which they borrow. This appears to be a result of a general condition of receiving foreign currency loans, regardless of whether such loans are provided by the Mexican credit institutions or foreign financial institutions. *See Doing Business in Mexico*, W2–5 (Article Six of the Decree). The particular effect of this policy on the firms involved in this proceeding was not addressed by the parties in a timely manner during the administrative proceedings. Thus, ITA need not consider it.

ITA consistently has held that FOMEX loans confer countervailable benefits. *See, e.g., Certain Iron–Metal Construction Castings from Mexico*, 48 Fed.Reg. 8834 (Mar. 2, 1983); *Carbon Black from Mexico*, 48 Fed.Reg. 29564 (Jun. 27, 1983); *Portland Hydraulic Cement and Cement Clinker from Mexico*, 48 Fed.Reg. 43063 (Sept. 21, 1983); *Lime from Mexico*, 49 Fed.Reg. 35672 (Sept. 11, 1984). In these same cases, ITA also determined that Mexico's dual exchange rate system did not confer countervailable benefits.[7] *Id.* In this case, however, plaintiffs do not argue the independent countervailability (or lack thereof) of either program, but rather, argue that the operation of the two programs together negates any subsidy in connection with FOMEX loans.

Plaintiffs argue that there is no bounty or grant because Mexico's dual exchange rate system eliminates any benefit which exporting firms might receive from export-related FOMEX loans. In the alternative, they argue that in calculating the "net subsidy," the loss resulting from Mexico's exchange rate system should be deducted as an "application fee, deposit, or similar payment paid in order to qualify for, or to receive the benefit of the subsidy." 19 U.S.C. § 1677(6) (Supp. III 1985).

## B.  THE EXISTENCE OF A BOUNTY OR GRANT

Congress has granted ITA wide latitude in determining whether a bounty or grant exists. *United States v. Zenith Radio Corp.*, 64 CCPA 130, 138, 562 F.2d 1209, 1216 (1977), *aff'd*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978). *See* S.Rep. No. 249, 96th Cong., 1st Sess. 84 (1979). As noted previously, in other circumstances ITA has determined that FOMEX loans constitute bounties or grants.

Plaintiffs cite *Robert E. Downs v. United States*, 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903); *G.S. Nicholas & Co. v. United States*, 7 Ct.Cust.Appls. 97, T.D. 36426, 30 Treas. Dec. 857, *aff'd*, 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919); and *Zenith Radio Corp. v. United States*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978) (*Zenith*) in support of the broad proposition that there must be an overall "benefit" to the exporter in order to find a bounty or grant. All three decisions involved the issue of whether rebates or remissions of indirect taxes are countervailable. In *Downs* and *Nicholas* the Treasury Department (the predecessor to ITA in these cases) imposed countervailing duties upon the excessive rebates or remissions of indirect taxes, while in *Zenith* Treasury

---

dollar loans were actually paid out in pesos involved loans received by a single firm after the period under investigation. C.R. 4 [Response of Tauro Textile]. That response merely listed FOMEX export loans in pesos. Export loans were identified as dollar loans by the Government of Mexico P.R. 36 at A.a.6, and listed as such by all other firms. C.R. 4. Finally, ITA's verification of FOMEX loans do not indicate that any loans listed in dollars had actually been paid out in pesos. C.R. 13.

**7.**  These cases involved an aspect of Mexico's dual exchange rate system not at issue here. Specifically, when exchanging pesos for U.S. dollars to make certain foreign purchases, companies were allowed to convert currency at the controlled rate (giving up fewer pesos per dollar than they would at uncontrolled rates). In most of those cases, ITA verified that the same dual exchange system which permits firms to exchange pesos for dollars at the controlled rate also requires exporters to exchange their U.S. dollars for pesos at the same rate (receiving fewer pesos for their dollars) and concluded that the program appears to harm rather than benefit Mexican exporters. *Carbon Black from Mexico*, 48 Fed.Reg. at 29567; *Iron-Metal Castings from Mexico*, 48 Fed.Reg. at 8837; *Portland Cement from Mexico*, 48 Fed.Reg. at 43067.

refused to impose countervailing duties upon nonexcessive rebate or remission of indirect taxes. In each case, the Supreme Court upheld the agency's determination. In the most recent case, the Supreme Court clearly indicated that its ruling was based upon deference to, and the reasonableness of, the specific administrative practice of not countervailing nonexcessive remissions of indirect taxes, first adopted less than one year after the passage of the basic countervailing duty statute in 1897. *Zenith*, 437 U.S. at 457–59, 98 S.Ct. at 2448–49.

The current statutory definition of a "subsidy," 19 U.S.C. § 1677(5) (1982), which has the same meaning as "bounty or grant," *see, e.g., PPG Industries, Inc. v. United States*, 11 CIT ——, ——, 662 F.Supp. 258, 264 (1987), provides a starting point for determining whether a specific export payment such as rebate of indirect taxes is countervailable. That definition explicitly incorporates export subsidies which are listed in the Annex to the GATT Subsidies Code. 19 U.S.C. § 1677(5). The legislative history of section 1677(5) acknowledges that export payments need not be considered countervailable subsidies: "if those payments are reasonably calculated, are specifically provided as non-excessive rebates of indirect taxes within the meaning of Annex A of the Agreement, and are directly related to the merchandise exported." S.Rep. No. 249, 96th Cong., 1st Sess. 84–85, *reprinted in* 1979 U.S. Code Cong. & Ad. News 381, 471. The Annex to the Subsidies Code recognizes as an export subsidy "[t]he exemption or remission in respect of the production and distribution of exported products, of indirect taxes in excess of those levied in respect of the production and distribution of like products when sold for domestic consumption."

Subsidies Code, Annex, item g, 31 UST at 546.

The special (non-countervailable) treatment afforded nonexcessive rebates of indirect taxes has been premised on the view that such rebates are a reasonable means of avoiding double taxation by the exporting and importing countries. *See Zenith*, 437 U.S. at 456, 98 S.Ct. at 2448. Without such remissions, consumption taxes might be imposed upon a product by both the exporting country, where it would not be consumed, and the importing country, where it would be consumed. *Id.* at 456–57, 98 S.Ct. at 2448–49. Non-excessive remission of such taxes is not considered to result in the type of competitive advantage that Congress intended to counteract. *Id. See also Zenith Electronics Corp. v. United States*, 10 CIT ——, ——, 633 F.Supp. 1382, 1398 (1986). In contrast, the Supreme Court in *Zenith* noted that, under both U.S. law and the General Agreement on Tariffs and Trade (GATT), remissions of *direct* taxes are countervailable, regardless of whether they are excessive or not. *Id.* 437 U.S. at 458 n. 14, 98 S.Ct. at 2449 n. 14.[8]

Given the very narrow problem at issue in *Zenith*, and its statutory and historical underpinnings, one cannot read the Supreme Court's opinion for the broad propositions which plaintiffs assert. Assuming *arguendo* that *Zenith* applies to anything other than non-excessive rebates of indirect taxes, it could only shed light on a very closely analogous situation. There are many reasons why the programs at issue cannot be analogized to non-excessive rebate of indirect taxes. Certainly Mexico's exchange rate policies do not fit within common notions of indirect taxes.[9] Fur-

---

**8.** After the *Zenith* opinion, that interpretation was reaffirmed under GATT in the Illustrative List of Export Subsidies annexed to the Subsidies Code. General Agreement on Tariffs and Trade: Interpretation and Application of Articles VI, XVI and XXIII of the General Agreement on Tariffs and Trade, 31 U.S.T. 513, 546–47, T.I.A.S. No. 9619 at 29–30 (Subsidies Code).

**9.** The terms direct and indirect taxes have been defined by the Subsidies Code as follows:

The term "direct taxes" shall mean taxes on wages, profits, interest, rents, royalties, and all other forms of income, and taxes on the ownership of real property;

\* \* \* \* \* \*

The term "indirect taxes" shall mean sales, excise, turnover, value added, franchise, stamp, transfer, inventory and equipment taxes, border taxes and all other taxes other than direct and import charges;

thermore, it is difficult to view the programs as effecting the type of non-excessive rebate which Congress had in mind in the indirect taxation area.[10]

Most importantly, there is no evidence that low interest rate FOMEX loans are specifically provided for the purpose of rebating or remitting the losses incurred by firms when their U.S. dollars are exchanged for pesos at the controlled rate of exchange. As defendant has noted "[t]here is simply no relationship between the receipt of FOMEX financing and the imposition of controlled exchange rates, other than the common idea that one must export in order to be eligible or subject to either one." Defendant's Brief at 21.[11] ITA has found, and plaintiffs do not dispute directly, that exchanging dollars for pesos at the controlled rate of exchange is a basic condition of exportation of certain products. The condition applies regardless of whether or not exporters have applied for or received FOMEX benefits. 50 Fed. Reg. at 10829. Although plaintiffs take issue with ITA's characterization that "this system applies to *practically all* exporters in Mexico," they do not dispute the fact that non-exempt exporters, including textile exporters, who neither applied for nor received FOMEX loans would still be subject to the controlled exchange rate.[12] The conversion of dollar export earnings to pesos at the less favorable controlled exchange rate is thus in the nature of a general expense, borne by the exporter in order to comply with a basic condition of exporting mandated by the 1982 decree.[13]

Thus, not only must the situation at hand be distinguished from non-excessive rebate of indirect taxes, but the court finds nothing in the three Supreme Court cases cited which aids plaintiffs in this case. The programs at issue operate so independently that the court cannot conclude that the benefits provided by FOMEX loans are negated by exchange rate policies in such a way that the loans are not subsidies. ITA is not required to consider the various policies regulating a country's economy in deciding whether a particular program is countervailable. The FOMEX

---

Subsidies Code, Annex, n. 1, 31 U.S.T. at 548. Websters defines these terms as follows:

**direct tax** *n*: a tax exacted directly from the person on whom the ultimate burden of the tax is expected to fall (property, income, gift, inheritance, and poll taxes are generally included under *direct taxes*)

**indirect taxes** *n*: a tax exacted indirectly from a person other than the one on whom the ultimate burden is expected to fall (excise and customs duties are generally included under *indirect taxes*)

Websters Third New International Dictionary 642 & 1152 (1981). *See also, American Express Co. v. United States,* 60 CCPA 86, 95 n. 9, 472 F.2d 1050, 1057 n. 9 (1973) ("Taxes levied directly on the sale of products and only indirectly related to income and profits, like excise, sales and turnover taxes are denominated generally 'indirect' taxes. Taxes levied on profits, as income and corporate profits taxes, constitute socalled 'direct' taxes.") and *Zenith,* 437 U.S. at 446, 98 S.Ct. at 2443 (" 'indirect' tax—a tax levied on the goods themselves").

In economic reality these distinctions might not be so clear, *see, e.g.,* Marks & Malmgren, *Negotiating Nontariff Distortions to Trade,* 7 L. & Policy in Int'l Bus. 327, 351 (1975), *cited in Zenith,* 437 U.S. at 458 n. 14, 98 S.Ct. at 2449 n. 14, but the distinctions have not been abandoned, as *Zenith* indicates. 437 U.S. at 458–459, 98 S.Ct. at 2449–50.

**10.** The Subsidies Code, as incorporated by 19 U.S.C. § 1677(5), states that a countervailable subsidy is the remission of indirect taxes "in excess of those levied in respect of the production and distribution of like products *when sold for domestic consumption.*" Subsidies Code, Annex, item g, 31 UST at 546 (emphasis added). As there is no equivalent of an indirect tax involved, there is no domestic corollary for comparison purposes.

**11.** To the extent that the controlled rate applies to certain non-export transactions, defendant has conceded too much.

**12.** After noting that certain significant industries are specifically exempt from the controlled rate that is applicable to exporters generally, plaintiffs merely conclude that: "[i]t is thus clear that the dual rate system does not apply to practically all exporters, although it does apply to these textile exporters." Plaintiff's Brief at 28.

**13.** The court does not reach the issue of lack of benefit resulting from the alleged granting of dollar loans in pesos or forced conversion of such loans. One might argue, however, that that conversion to pesos at the controlled rate (pursuant to the December 20, 1982 decree), is in the nature of a general expense imposed upon all foreign currency loans as part of Mexico's overall monetary policies.

program clearly benefits those firms that participate in it; the fact that exporters incur losses under the exchange rate system does not render ITA's finding that the FOMEX program confers a bounty or grant erroneous.

## C. THE AVAILABILITY OF OFF-SETS IN DETERMINING NET SUBSIDIES

▆ Plaintiffs argue that the forced surrender of the dollar value of textile exports resulting from Mexico's controlled exchange rate system should be subtracted from the gross subsidy, pursuant to 19 U.S.C. § 1677(6)(A), as an "application fee, deposit, or similar payment paid in order to qualify for, or to receive the benefit of the subsidy." Plaintiffs' Brief at 29–30.[14]

In its final determination, ITA (DOC) responded to plaintiffs' proposed offset of exchange rate losses as follows:

*DOC Position:* Section 771(6) of the Act [19 U.S.C. § 1677(6)] provides for three types of permissible offsets in the calculation of a net subsidy. The Department has consistently interpreted this provision as the exclusive source of permissible offsets. Adjustments which do not strictly fit the descriptions under section 771(6) have been disallowed.

The Department has previously acknowledged that the dual exchange rate system in Mexico potentially harms Mexican exporters. See *Portland Hydraulic Cement and Clinker from Mexico,* 48 FR 43063 (1983). Yet this system applies

to practically all exporters in Mexico regardless of whether those exporters have applied for or received FOMEX financing. Exchanging dollars at the controlled rate is a condition of exporting, rather than an application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit or [sic] a specific subsidy program. Therefore, the effects of the dual exchange system have not been taken into account in the calculation of the benefits of FOMEX loans.

50 Fed.Reg. at 10829.

ITA's narrow and strict interpretation of 19 U.S.C. § 1677(6) is supported by the legislative history of that provision, which states that "[f]or the purposes of determining the net subsidy, there is subtracted from the gross subsidy only the items specified in [19 U.S.C. § 1677(6)]. The list is narrowly drawn and is all inclusive." S.Rep. No. 249, 96th Cong., 1st Sess. 86 (1979), 1979 U.S.Code Cong. & Admin. News, p. 472. By not incorporating certain previously recognized offsets into section 1677(6), Congress intended "to place clear limits on offsets from a gross subsidy." *Id.*

ITA has consistently limited offsets in the calculation of a net subsidy to those offsets provided for under section 1677(6), *see, e.g., Cotton Sheeting and Sateen from Peru,* 48 Fed.Reg. at 4506; *Cotton Yarn from Peru,* 48 Fed.Reg. at 4513, and disallowed offsets which do not fall precisely within that list. *See, e.g., Certain Steel Products from Spain,* 47 Fed.Reg. 51438,

---

**14.** Plaintiffs limit their grounds for seeking an offset to the statutory definition of "net subsidy" under 19 U.S.C. § 1677(6)(A), and do not argue that ITA has discretion to apply additional offsets in determining the "net amount of such bounty or grant" under 19 U.S.C. § 1303. The reasons for limiting the offsets available in calculating the "net amount of such bounty or grant" to those provided for in the calculation of "net subsidy" have been explained by ITA (DOC) in previous determinations.

Section 771(5) of the Act explicitly states that the term "subsidy" has the same meaning as the term "bounty or grant." References in the legislative history to a broad definition of the term subsidy apply equally to the term "bounty or grant" and to the term "subsidy." Defining the term "bounty or grant" in a more

restrictive sense than the term "subsidy" would be *ultra vires* and would in effect penalize countries that had signed the Subsidies Code.

\*   \*   \*   \*   \*   \*

The DOC has consistently limited offsets in the calculation of a net subsidy to those offsets provided for under section 771(6) regardless of whether the DOC was conducting its investigation under section 303 or under Title VII of the Act.

*Cotton Sheeting and Sateen from Peru,* 48 Fed. Reg. 4501, 4506 (Feb. 1, 1983); *Cotton Yarn from Peru,* 48 Fed.Reg. 4508, 4513 (Feb. 1, 1983). *See also PPG Industries, Inc. v. United States,* 11 CIT ——, ——, 662 F.Supp. 258, 264 (1987) and cases cited therein.

51447 (Nov. 15, 1982) (no offset for losses due to government price suppression); *Certain Carbon Steel Products from Brazil,* 49 Fed.Reg. 17988, 17996 (April 26, 1984) (no offset for reduced value due to administrative delay in disbursement of benefit); *Galvanized Carbon Steel Sheet from Australia,* 49 Fed.Reg. 29998, 30001 (July 15, 1984) (no offset for taxes on benefits received).

As indicated in the previous section, exchanging dollars for pesos at the controlled rate of exchange is in the nature of a general expense which is a basic condition of exporting. It is not an "application fee, deposit or similar payment paid in order to qualify for, or to receive the benefit of the subsidy." *Cf. Frozen Concentrated Orange Juice from Brazil,* 48 Fed.Reg. 8839, 8841 (Mar. 2, 1983) (cost of complying with conditions for obtaining export licenses is in the nature of a general expense rather than an offset under 19 U.S.C. § 1677(6)(A)).

## II. ITA'S FAILURE TO USE THE GOVERNMENT OF MEXICO'S COST OF BORROWING AS THE STANDARD FOR COMPARISON WITH FOMEX LOANS

■ Plaintiffs contend that ITA erred in using the U.S. Federal Reserve rate for short term business loans as a basis for comparison with FOMEX dollar loans, rather than the Government of Mexico's cost of borrowing. Plaintiffs reason that use of the Government of Mexico's cost of borrowing is mandated by 19 U.S.C. § 1677(5), which states, *inter alia* that

The term 'subsidy' has the same meaning as the term 'bounty or grant' as that term is used in section 1303 of this title, and includes, but is not limited to, the following:

(A) Any export subsidy described in Annex A to the Agreement (relating to the illustrative list of export subsidies).[15]

As plaintiffs note, item k of the "Illustrative List of Export Subsidies," describes "[t]he grant by governments ... of export credits at rates below those which they have to pay for the funds so employed (or would have to pay if they borrowed on international capital markets in order to obtain funds of the same maturity and denominated in the same currency as the export credit)." Subsidies Code, Annex, 31 U.S.T. at 547.

The Illustrative List of Export Subsidies annexed to the Subsidies Code, by its very terms, merely sets forth select examples of specific practices that constitute export subsidies. It is not an exclusive listing. Furthermore, the list only identifies countervailable practices; it does not specify the methodologies by which the amounts of specific subsidies and countervailing duties are calculated.[16]

---

**15.** Item k of the list identifies one export subsidy as:

(k) The grant by governments (or special institutions controlled by and/or acting under the authority of governments) of export credits at rates below those which they actually have to pay for the funds so employed (or would have to pay if they borrowed on international capital markets in order to obtain funds of the same maturity and denominated in the same currency as the export credit), or the payment by them of all or part of the costs incurred by exporters or financial institutions in obtaining credits, in so far as they are used to secure a material advantage in the field of export credit terms.

Provided, however, that if a signatory is a party to an international undertaking on official export credits to which at least twelve original signatories to this Agreement are parties as of 1 January 1979 (or a successor undertaking which has been adopted by those original signatories), or if in practice a signa-

tory applies the interest rates provisions of the relevant undertaking, an export credit practice which is in conformity with those provisions shall not be considered an export subsidy prohibited by this Agreement.

General Agreement on Tariffs and Trade: Interpretation and Application of Articles VI, XVI and XXIII of the General Agreement on Tariffs and Trade, Annex, 31 U.S.T. 513, 547, T.I.A.S. No. 9619, at 30 (footnote omitted) (Subsidies Code).

**16.** Most of the countervailable practices listed in the Subsidies Code are stated in terms that could not possibly be mistaken as methodological specifications, for example:

(a) The provision by governments of direct subsidies to a firm or an industry contingent upon export performance.

(b) Currency retention schemes or any similar practices which involve a bonus on exports.

The statutory definition of "subsidy" is similarly inclusive, rather than exclusive. It includes all practices determined to constitute a bounty or grant under 19 U.S.C. § 1303. 19 U.S.C. § 1677(5). In fact, it even explicitly includes "[t]he provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations...."[17] 19 U.S.C. § 1677(5)(B)(i). Thus, under section 1677(5), ITA was not limited to using the Government of Mexico's cost of borrowing for comparison with the FOMEX loans at issue.[18]

## III. ITA'S DISREGARD OF CHANGES IN FOMEX INTEREST RATES THAT TOOK EFFECT AFTER THE PERIOD UNDER CONSIDERATION

ITA was informed by the Government of Mexico, prior to the preliminary determination, that the interest rates on certain FOMEX loans were increased during the period of April through June 1984. Although the period covered by ITA's determinations was the calendar year 1983, ITA initially defined the period under investigation to include 1983 and any fiscal quarters completed thereafter. P.R. 15. The Government of Mexico's response to ITA's questionnaire indicated that certain interest rates for FOMEX loans had been increased for the period of April through June 1984, and that such rates would be reviewed every three months. P.R. 36 at A.a.6. and Exhibit I. The Government's response was dated October 1, 1984, three months prior to ITA's preliminary determination of January 3, 1985.[19]

Plaintiffs argue that ITA erred in ignoring these increases, even though they took effect after the period of investigation. They contend that ITA's longstanding policy has been to use the most recent available information in determining the rate of cash deposits resulting from the FOMEX program.

While acknowledging that in the past ITA has taken into account program-wide changes occurring after the period under investigation but before the preliminary determination, defendant disputes the significance of such practice—

It is true that the ITA has in certain cases adjusted the countervailing duty deposit rate to reflect program-wide changes which occurred before the preliminary determination. *See e.g. Certain Textile Mill Products from Peru*, 50 Fed.Reg. 9871 (1985). However, the ITA

* * * * * *
Subsidies Code, Annex, 31 U.S.T. at 546.

**17.** Paragraph B of 19 U.S.C. § 1677(5) provides:
  (B) The following domestic subsidies, if provided or required by government action to a specific enterprise or industry, or group of enterprises or industries, whether publicly or privately owned, and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise:
  (i) The provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations.
    * * * * * *

**18.** Plaintiffs do not argue that ITA erred in generally failing to use a comparable commercial rate for dollar loans in Mexico, rather than in the U.S. Apparently, however, ITA's policy is to use the rates for dollar loans in Mexico.
  For loans denominated in a currency other than the currency of the country concerned in an investigation, the benchmark is selected from interest rates applicable to loans denominated in the same currency as the loan under consideration (where possible, interest rates on loans in that currency in the country where the loan was obtained; otherwise, loans in that currency in other countries, as best evidence).
*Cold-Rolled Carbon Steel Flat-Rolled Products from Argentina*, 49 Fed.Reg. 18006, 18019 (Apr. 26, 1984) ("Subsidies Appendix" setting forth general methodological principles) (explicitly incorporated in the final determination in this case at 50 Fed.Reg. 10825). Although ITA never explained its use of U.S. Federal Reserve rates in this case, it has justified the use of such rates in other cases involving FOMEX dollar denominated average commercial short-term interest rates for dollar denominated loans in Mexico. *Bricks from Mexico*, 49 Fed.Reg. 19564, 19565 (May 8, 1984); *Bars and Shapes from Mexico*, 49 Fed.Reg. 32887, 32888 (Aug. 17, 1984).

**19.** In fact, ITA was informed of these rate changes at the very start of its investigation. An appendix to the countervailing duty petition contained a copy of the Government of Mexico's letter of June 22, 1984, to ITA, informing it of the April 1984 FOMEX interest rate increases. P.R. 1. This same letter was attached to the Government of Mexico's response. P.R. 36 at Exhibit I.

has not adopted a sweeping rule that is to be blindly applied whenever any modification takes place before a preliminary determination. Rather, these decisions are made on a case-by-case basis. Defendant's Brief at 34.

■ Defendant's assertion here that deposit rates are only adjusted in certain cases, on a case-by-case basis, is not reflected in ITA's previously stated position that "it has long been the Department's policy to take program-wide changes into account where they are implemented after the period we investigate, but prior to a preliminary determination." *Certain Textile Mill Products from Peru,* 50 Fed.Reg. 9871, 9873 (Mar. 12, 1985) (final determination). *See also Certain Textile Mill Products from Peru,* 49 Fed.Reg. 49678, 49679 (Dec. 21, 1984) (preliminary determination); *Carbon Steel Plate from Brazil,* 48 Fed. Reg. 2568, 2570s & 2577 (Jan. 20, 1983) (final determination); *Litharge, Red Lead and Lead Stabilizer from Mexico,* 50 Fed. Reg. 36912 (Sept. 10, 1985) (preliminary results of administrative review); and *Portland Hydraulic Cement from Mexico,* 50 Fed.Reg. 51732, 51735 (Dec. 19, 1985) (final results of administrative review). While ITA has discretion to shape its own long-standing policies and limit the circumstances to which they will apply, it must not apply such policies arbitrarily.

■ ITA based its decision not to apply its long-standing policy in this case upon the nature of FOMEX loans programs at issue and verifiability of information.

We attempt to take into account program-wide changes that occur prior to our preliminary determination when changes can be verified. However, for certain types of programs this is not always possible. The effects of modifications in short-term loan programs are not easily quantified, nor do they occur immediately. In this case, the verified companies were unable to provide sufficient information to substantiate the claim that the textile companies use the new FOMEX interest rates. Thus, we used the interest rates supplied to us by the Mexican government for the period of investigation, 1983.

50 Fed.Reg. at 10829. In addition, defendant notes that the nature of the FOMEX loans at issue is such that "there was no indication that the more recent rates would remain constant, an unlikely prospect given past fluctuations and variations in the rates of FOMEX financing." Defendant's Brief at 35.

ITA does not provide any basis for distinguishing its disregard of the April 1984 changes in FOMEX interest rates in this case, from its consideration of those very same changes in other cases. In the *Portland* and *Litharge* cases, ITA addressed the issue of interest rate changes in FOMEX pre-export and export (short-term) loans which occur beyond the period under review.[20] ITA was presented in those cases, as it was in this case, with periods of investigation which did not extend beyond 1983, as well as with the same April 1984 FOMEX interest rate changes which occurred prior to its preliminary publications in 1985. *See Portland Hydraulic Cement and Cement Clinker from Mexico,* 50 Fed. Reg. 27476 (July 3, 1985) (preliminary results of administrative review); *Litharge* 50 Fed.Reg. 36912. In the *Portland* and *Litharge* cases, unlike this case, ITA used the April 1984 interest rates. *Portland,* 50 Fed.Reg. at 24747; *Litharge,* 50 Fed.Reg. at 36912. ITA expressed no difficulty in quantifying the effects of the April 1984 modifications in FOMEX pre-export and export (short-term) loans in the *Portland* and *Litharge* preliminary reviews.

Defendant's belated concern with fluctuations and variations in FOMEX interest rates does not reflect ITA's initial position in either this case or its position in the *Portland* and *Litharge* cases. When it informed ITA of the April 1984 changes in FOMEX interest rates, the Government of Mexico stated that these rates were to be

---

**20.** While *Portland* and *Litharge* involved program changes that occurred after the review period in a section 751 administrative review, ITA treats such changes in the same manner as it treats program changes that occur after the period of investigation in initial determinations. *See Carbon Steel Plate from Brazil,* 48 Fed.Reg. 2568, 2577 (Jan. 20, 1983) (final determination).

reviewed every three months. P.R. 36, Exhibit I. These rates did not, in fact, remain constant, nevertheless, in other cases ITA repeatedly applied the latest rates without expressing any concern over their variations and fluctuations. When FOMEX interest rates changed again in October of 1984, ITA merely incorporated these newer rates into its final results of the 1983 review in *Portland.* 50 Fed.Reg. at 51735. In September of 1985 FOMEX interest rates changed still another time, but ITA continued to follow its long-standing policy and incorporated these newest rates into the final results of the 1983 review in *Litharge. Litharge, Red Lead and Lead Stabilizers from Mexico,* 51 Fed.Reg. 6450, 6451 (Feb. 24, 1986) (final results of administrative review).

The fact that "the verified companies were unable to substantiate the claim that the textile companies use the new FOMEX interest rates" in this case is not compelling. As a preliminary matter, it is FOMEX, rather than any individual recipient of FOMEX loans, who determines the applicable rates. In any event, it appears that it was ITA's own decision to limit the investigation to 1983, coupled with its failure to verify any 1984 figures, even for the limited purpose of substantiating the new rates, which precluded verification of the April 1984 rates.

ITA had every opportunity to verify the April 1984 FOMEX interest rates. It was informed early on of those changes by the petitioner, by the Government of Mexico, and by individual producers. When ITA conducted its verification at FOMEX, the April 1984 FOMEX interest rates were once again brought to ITA's attention. C.R. 13 (Verification of Mexican Government Responses). ITA's verification reports contain numerous references to 1983 loan documents, but are silent regarding any attempt to review 1984 loan documents and substantiate the April 1984 rates. C.R. 13.

Although it is clear that ITA may vary its practices based upon the requirements of particular cases, where the practice is an established one, and no reason is apparent for deviation from the practice, the action cannot be sustained.

## IV. CALCULATION OF A COUNTRY–WIDE COUNTERVAILING DUTY RATE FOR FOMEX LOANS

■ ITA's final affirmative determination and order set forth a single country-wide countervailing duty deposit rate. This rate applies to over 2,000 textile firms, 95% of which are small or medium sized. The Government of Mexico initially gave ITA a list of 27 firms representing 85% of the exports to the United States. ITA focused its investigation on 22 of the 27 firms.[21] Six of the 22 firms, as well as seven others, made timely applications for, and received, exclusion from ITA's order.

According to defendant, ITA intended to calculate the country-wide rate by taking the benefits received by 16 non-excluded firms and dividing them by the total exports to the United States of those same 16 non-excluded firms. This was not done. Defendant concedes that ITA erroneously divided the benefits of those 16 firms by the exports of only eight firms, and that one of those eight firms had been removed from the scope of the petition at the request of petitioners. Defendant requests a remand for the purpose of correcting these errors.

Plaintiffs argue that if ITA uses a single country-wide rate, it must do so in a reasonable manner, and that equity requires that it take into account the exports of all, not just 16, of the firms at issue. Plaintiffs contend that the benefits figure used by ITA captures almost the totality of FOMEX benefits received on a country-wide basis, but argue that the exports figure represents only about 40% of the total val-

**21.** Five of the 27 companies produced products which were removed from the class covered by the scope of ITA's investigation. One company produced yarns which were already subject to a suspension agreement in a previous countervailing duty determination. 50 Fed.Reg. at 302 and

Defendant's Brief at 36. Two companies did not export the subject merchandise to the U.S. during the period of review, and another two produced products which were not within the scope of the petition as amended. Defendant's Brief at 36.

ue of exports to the United States of textiles subject to ITA's investigation. Plaintiffs' Brief at 39 and Plaintiffs' Reply at 12.

## A. BASING A COUNTRY–WIDE RATE UPON TOTAL BENEFITS AND TOTAL EXPORTS

It has been ITA's long-standing practice to use country-wide rates, rather than company specific rates, where at all possible. *See, e.g., Ceramic Tile from Mexico,* 47 Fed.Reg. 20012, 20013 (May 10, 1982). This practice has been endorsed by Congress in enacting a legislative presumption in favor of country-wide rates, 19 U.S.C. § 1671e(a)(2) (Supp. III 1985),[22] and upheld by this court. *Ceramica Regiomontana, S.A. v. United States,* 10 CIT ——, ——, 636 F.Supp. 961, 968 (1986), *aff'd,* 810 F.2d 1137 (Fed.Cir.1987).

Given the number of firms which are subject to the order at issue, it is apparent that ITA's resources would not permit it to establish a company specific rate for each firm. ITA's resources also would be strained to unacceptable levels if it had to investigate each and every firm in order to calculate a single country-wide rate. This does not mean necessarily that ITA cannot calculate a single country-wide rate which is derived from a fair average of the aggregate benefits and exports of every firm potentially subject to ITA's order. In this case, a national average might be calculated by dividing the total value of FOMEX benefits granted to the firms at issue, if that figure is known or is reasonably determinable, by the total value of exports to the United States.

It is apparent that ITA had ready access to information on all FOMEX loans and all exports to the United States of the textiles at issue. In its verification of the Mexican Government's responses, ITA "looked at a computer print-out of all FOMEX loans to all companies during calendar year 1983." P.R. 113 and C.R. 13 (Verification of Mexican Government). ITA also had figures for the total value of exports to the United States of the products under investigation. P.R. 71 (memo accompanying preliminary affirmative determination).

It is not so clear, however, whether ITA's benefits figure is actually based upon all FOMEX loans used for United States exports of the textiles at issue. In its final determination, ITA stated that "Because FOMEX loans are export-related and we had data on all FOMEX loans to the United States, we allocated the benefit of the companies who actually received FOMEX financing over the exports to the United States of the 15 major exporters." 50 Fed.Reg. at 10825. But defendant also states:

> The Department considered only the benefits received by major exporters, restricting its verification at the offices of the government only to those firms and the eleven other companies which had requested exclusion. Thus, the rate established by ITA's final determination is only *representative* of the amount of benefits received throughout the country, and it is impossible to know the level of benefits received by the other producers.

Defendant's Brief at 39.

If ITA did in fact capture the total value of all of the benefits bestowed by FOMEX loans on exports of textiles to the United States, then a reasonable approach would

**22.** The statute was amended to provide that countervailing duty orders

> (2) shall presumptively apply to all merchandise of such class or kind exported from the country investigated, except that if—
> (A) the administering authority determines that there is a significant differential between companies receiving subsidy benefits, or
> (B) a State-owned enterprise is involved, the order may provide for differing countervailing duties....

19 U.S.C. § 1671e(a)(2) (Supp. III 1985). The Conference Report to the Trade and Tariff Act of 1984 explained that

> [t]his provision is intended to lessen the administrative burden on the administrative authority stemming from implementing company-specific rates. The amendment continues to permit individual company rates for significant differences in benefits. The administering authority is expected to determine under what conditions company-specific rates are appropriate when one of the requirements of paragraph 2 are met.

H.R.Conf.Rep. No. 1156, 98th Cong., 2d Sess. 180, *reprinted in* 1984 U.S. Code Cong. & Ad. News 4910, 5220, 5297.

be to divide that total by the total value of all of the relevant textile exports to the United States. Because the country-wide rate is to be applied to non-investigated companies, the fact that the total FOMEX benefits at issue may have been received by only a handful of firms does not alter the need to divide those benefits by the total exports of all 2,000 firms in order to arrive at an approximate national average. Thus, if the 16 nonexcluded firms received all of the FOMEX benefits at issue, ITA's approach of dividing those benefits by the exports of those same 16 firms is unreasonable in that it will not yield a national average rate for all 2,000 firms, but rather, it will only yield an average rate for those 16 firms.

On remand, ITA should explain whether it has in fact captured all of the FOMEX benefits at issue. If it has, in order to arrive at one representative rate it should compare those benefits to the total exports of the approximately 2,000 firms producing and exporting the textiles at issue. If ITA has not captured, or cannot verify that it has captured, all FOMEX benefits at issue, it should explain the difficulty and use a reasonable alternate method of calculating one widely applicable deposit rate. If total benefits cannot be known, one reasonable alternative or part of a reasonable alternative may be to calculate a country-wide rate from a representative sample.

## B. BASING A COUNTRY-WIDE RATE UPON A REPRESENTATIVE SAMPLE OF FIRMS

Plaintiffs have not specifically challenged, either here or at the administrative level, the issue of whether ITA may base its country-wide rate upon a sample of firms.[23] They argue, however, that "[i]f ITA's workload requires the use of a country-wide rate, then it should include in the calculation of benefits the exports of all

companies on which it had data, or at least it should use a two-tier rate." Plaintiffs Reply at 14.

Defendant argues that ITA does not intend, upon remand, "to include in its recalculation of the benefit received from FOMEX loans any consideration of the firms who requested and received exclusions from the scope of the countervailing duty order because they received no more than *de minimis* subsidies." Defendant's Brief at 38. Defendant acknowledges that although "the sole source of authority rests in [ITA] Regulations, at [19 C.F.R.] section 355.38," that section "is silent with respect to whether excluded firms should be included in the basis upon which the deposit rate is determined." Defendant's Brief at 40. Defendant reasons that

The Department's decision not to use the excluded firms' exports in the denominator of the FOMEX loan calculations is consistent with its normal practice, and the practice is based upon reasonable considerations. It is the Department's usual practice to remove from the calculations of country-wide countervailing duty rates any consideration of either the subsidies or production and exportation of firms which are excluded from that determination.

*Id.* at 40–41. The rationale for this practice, according to defendant, is that excluded firms are, in essence, receiving a " 'negative rate' or a rate of zero," while the nonexcluded firms, who "are either actually or presumably being subsidized at a rate above *de minimis*" receive a country-wide " 'affirmative' rate." *Id.* at 41.

Defendant provides no citations to any source which might shed light upon the existence, specific nature, or scope, of ITA's "usual practice." In any event, the facts of this case argue against the application of what might otherwise be a reasonable practice of disregarding excluded

**23.** ITA has attempted to justify its decision not to investigate all of the firms in this case by citing to its final negative determination in *Certain Textile Mill Products and Apparel from Malaysia,* 50 Fed.Reg. 9852, 9854–56 (March 12, 1985). 50 Fed.Reg. at 10825. Apparently, the only criteria it applies is that the firms investigated account for at least 60 percent of the merchandise in question.

While the 26 firms that ITA investigated initially appeared to account for 60 percent of the textiles at issue, two of those firms, and their products, were excluded from the scope of ITA's investigation. Thus, if 60 percent is a proper threshold for investigation of products of the class to be affected, it likely has not been met.

firms in arriving at a country-wide rate.[24] In this case, ITA is basing its country-wide rate upon a relatively small sampling of firms and applying it to thousands of firms that were never actually investigated. By definition, this country-wide rate must bear some relation to an approximate average rate for all 2,000 firms.

As defendant's analysis indicates, ITA's action amounts to the adoption, in effect, of two separate rates, basing the "negative" rate upon the six excluded firms and the "affirmative" rate upon the remaining 16 investigated firms. This might pose little problem in an industry composed of only 22 investigated firms. In this case, however, these 22 firms constitute a sample of an industry composed of some 2,000 firms.[25] ITA has provided no basis for concluding that either the "affirmative" rate or the "negative" rate is more representative of the total industry. By adopting the "affirmative" sample rate, and disregarding the "negative" sample rate, for the purpose of determining a single country-wide rate for this industry, ITA has undermined the representativeness of its country-wide rate.[26] Under all of the circumstances of this case, it is unreasonable for ITA to exclude certain investigated firms, which did not receive greater than *de minimis* benefits, from the sample upon which a representative country-wide rate might be based.

## C. ACCOUNTING FOR MATERIAL OR SUBSTANTIAL DIFFERENCES IN BENEFITS

■ Plaintiffs argue that only five firms made extensive use of FOMEX benefits

24. In *Ceramica* the court found that it was reasonable for ITA to use a country-wide rate which excluded firms that received no countervailable subsidy. 636 F.Supp. at 968. In that case, however, ITA was concerned with a subsidy program that bestowed benefits in an amount equal to a percentage of the value of exported merchandise. Thus, the subsidy rate was the same for each firm that received benefits. That rate did not reflect the fact that certain firms did not apply for and receive any benefits. ITA provided, however, for a certification process that would allow such firms to receive a zero rate (even though they had not made timely applications for exclusion from ITA's order pursuant to 19 C.F.R. § 355.38). *See, e.g.*, 636 F.Supp. at 965.

25. Plaintiffs have not challenged the representativeness of the sample with which the ITA began and the court merely assumes that the sample was not unreasonably unrepresentative. It may be, however, that ITA began with a sample that was in fact unrepresentative. For example, by limiting its investigation to a few dozen of the largest firms in an industry which was largely made up of small to medium sized firms, ITA was able to use its resources to account for a larger percentage of exports. To the extent that subsidies are utilized at different rates, for whatever reason, depending upon firm size, ITA may have chosen a sample that was inherently unrepresentative.

Apparently, ITA is under the erroneous impression that it need not be concerned with the representativeness of its samples. *See* 50 Fed. Reg. at 9855 ("The Department has not 'assumed' anything regarding the 40 percent of exports not covered by its questionnaires. All the Department sought to do was to ensure accurate subsidy rates for the covered exports."). While ITA's sample might not have to meet the rigors of statistical sampling techniques, it must use the means reasonably available to it to avoid samples that are unrepresentative.

26. Plaintiffs argue that ITA has "captured almost the totality of all FOMEX benefits received on a country-wide basis." Plaintiffs' Brief at 39. The government's position has been equivocal. *Compare* P.R. 114 at 23 (ITA questioned petitioners as to whether there is "any basis in fact for proposition that the smaller [uninvestigated] companies in fact receive subsidization," and characterized petitioners' hypothetical response as indicating that "there is no basis.") *and* 50 Fed.Reg. at 10825 (ITA stated in its final determination that "we allocated the benefit of the companies who actually received FOMEX financing over the exports to the United States of the 15 major exporters.") *with* Defendant's Brief at 39 (the rate "is only representative of the amount of benefits received throughout the country, and it is impossible to know the level of benefits received by the other producers).

If plaintiffs' allegation is true, then it appears that the "negative" or "zero" rate would be more representative of the large number of small uninvestigated firms than the higher "affirmative" rate. In any case, even defendant seems to assume that under its methods the higher "affirmative" rate will be applied to some uninvestigated firms which are not receiving any subsidization. Defendant's Brief at 41. It seems particularly unlikely in this case that many of those eligible for exclusion actually sought it. In addition, in this case eligibility for exclusion does not cure the unfairness of imposition of an excessive rate on those receiving benefits slightly above the *de minimis* level.

while the remaining investigated firms only received *de minimis* or small benefits. Plaintiffs note that ITA's regulations require it to take material differences into account, and submit that ITA erred in failing to establish a two-tier rate in this case.

Defendant argues that ITA properly refused plaintiff's request to establish a two-tier rate because it found that the levels of benefits were not significantly different and quotes ITA's final determination in support:

> Section 355.33 of the Commerce regulations provides that when separate enterprises have received materially different benefits those differences shall be taken into account in a final countervailing duty determination. In light of the fact that the country-wide rate is only 3.7 percent, this condition is not satisfied, so we have declined to create a two tier rate. However, the 13 companies which made timely requests for exclusion and were verified as receiving no benefits above *de minimis* have been excluded.

50 Fed.Reg. at 10830. Defendant also cites 19 U.S.C. § 1671e(a) and concludes that ITA's "decision was clearly reasonable in light of the large number of Mexican textile exporters and the low 3.7% deposit rate." Defendant's Brief at 43.

ITA's regulation at 19 C.F.R. § 355.33 (1984) specifically provides for the making of final determinations, and states, *inter alia:*

> (f) *Contents of Final Determinations.* The final determination shall include conclusions with regard to all facts and issues of law considered material to the Determination. If the Determination is affirmative, the amount of the net subsidy shall be estimated and stated,

and the nature of the subsidy determined. If separate enterprises have received materially different benefits, such differences shall be estimated and stated.

19 C.F.R. § 355.33(f). As noted earlier, the statute provides that "if—(a) the administering authority determines that there is a significant differential between companies receiving subsidy benefits ... the order may provide for differing countervailing duties." 19 U.S.C. § 1671e(a)(2) (Supp. III 1985).

The statute and regulations do not specify what constitutes a material or significant difference, or exactly how the provision for differing countervailing duties is to be accomplished.[27] Rather, they provide that the difference is to be evaluated by comparing levels of benefits among companies, rather than by comparing a country-wide rate and the rate of subsidization of a particular company. *See* 19 U.S.C. § 1671e(a)(2) and 19 C.F.R. § 355.33(f). Apparently, ITA also interprets the statute to refer to the differences among company rates. *Certain Iron-Metal Castings from India,* 51 Fed.Reg. 45788, 45791 (Dec. 22, 1986) (Final Results of Administrative Review).

ITA explained its finding of no material differences in this case, however, in terms of the simple fact that the country-wide rate was 3.7%. The level of the country-wide rate has no bearing upon the question of whether the benefits received by individual companies were materially different from each other.

Defendant provides a *post hoc* explanation for ITA's finding based upon the large number of firms at issue. The court agrees that as the number of firms increases, it may be reasonable for ITA to apply a

---

**27.** ITA's position appears to be that "[w]here a company receives *de minimis* benefits, we consider that to be a 'significant differential' warranting company specific treatment under [the statute]." *Certain Stainless Steel Hollow Products from Sweden* 52 Fed.Reg. 5794, 5794 & 5801 (Feb. 26, 1987) (Final Determination) (finding the difference between .06 percent and 2.18 percent significant). *See, e.g. Ceramic Tile from Mexico,* 51 Fed.Reg. 20871, 20872 (June 9, 1986) (treating country-wide rate of 2.10 percent and separate zero rate as significant); *Portland Hydraulic Cement,* 50 Fed.Reg. 51732 (Dec. 19, 1985) (involving zero rate for five firms and 3.28 to 3.50 percent for all others). To the extent that this is a blanket rule which might apply to differences as slight as a *de minimis* benefit .49 percent and a positive benefit of .50 percent in this case, the court finds this position arbitrary.

greater threshold in determining whether differences among companies should trigger varying rates. In this case, however, there is no indication that ITA considered in any manner the differences among companies.

Upon remand, if ITA finds that the benefits received by investigated companies in this case are materially or significantly different from each other, "such differences shall be estimated and stated," as required by 19 C.F.R. § 355.33(f) and ITA's "order may provide for differing countervailing duties," as provided at 19 U.S.C. § 1671e(a)(2). Depending upon the actual rates calculated and other circumstances it may be appropriate to establish one representative country-wide rate. It also may be appropriate to use company specific rates in combination with a representative rate, it may be appropriate to use tiered rates, or it may be appropriate to use some method which allows for qualification for a zero rate. The court is not in a position to decide what is administratively feasible. It does find, however, that the method chosen thus far, that is, use of one unrepresentative rate, is neither reasonable nor in accordance with law.

The court grants defendant's request to remand this case to ITA for correction of acknowledged errors and further orders that the proceeding on remand and the resulting determination shall be in accord with this decision. ITA shall report its results in 45 days.

SO ORDERED.